United States v. Seekins. May it please the Court. My name is Kevin Joel Page and I represent Joshua Seekins. Your Honors, Mr. Seekins received 70 months in federal prison for possessing two shotgun shells that he probably found somewhere. One of them was in his pocket and the other was chambered in a bright orange flare launcher with the end cut off. If anyone had ever tried to fire that shell in the flare launcher, it would have self-destructed. These unusual facts create several problems for the government's case, both as to guilt, innocence and as to the sentence. I propose to begin with the first issue in the brief, which is whether the government offered sufficient proof that Mr. Seekins knew he had a shotgun shell in his flare launcher and in his pocket, as opposed to a flare shell. But as I've recently learned, I don't always guess correctly which issues interest the panel, so please liberally redirect me to your own issues and questions. Shotgun shells and flare shells are strikingly similar objects, as I've tried to show with pictures in the brief. They both have very much the same shape and they can be the same length and caliber. These similarities are especially significant here because it's very unlikely that Mr. Seekins bought the shells that he possessed. He told the police that he found them, perhaps found them in a dumpster. How much difference is there in the weight between a shotgun shell and a flare gun shell? In percentage terms, there may be a substantial difference, but in absolute terms, very little because a shotgun shell weighs about an ounce. So we're talking about an object that weighs about what a pencil weighs compared to something that weighs, say, half as much as a pencil. That's not a difference that really stands out to the hand. And I think it's also particularly significant that there isn't any evidence in the record that Mr. Seekins has ever possessed a flare shell for comparison. So he has something that weighs about an ounce, weighs what a pencil weighs, because it isn't a shotgun shell. But we don't have any reason to think that he has anything to compare that to. But he knows what a shotgun shell weighs. Well, I don't know that that's... No, I don't think that's shown by the record at all. He possesses two shotgun shells. We don't... It's disputed whether he knows they're shotgun shells. There is an 18-year-old conviction for possessing shotguns, stealing shotguns and other firearms. There isn't any evidence in the record, and certainly not in the stipulation, that he possessed shells at that time. So I think the government wanted the jury to infer a sort of global understanding of munitions based on this 18-year-old conviction. The PSR on paragraph 34 demonstrates pretty well why that is not a reasonable inference. The stipulation shows. In that case, the defendant and three Confederates move guns out of a camper shell into some bushes and then take them later from another car into a vacant house. There's no reason to think that there was any intensive study or anything, any relationship to those guns more than necessary to load them and unload them. In any case, they're not shells, and it's astounding what the human mind can forget in 18 years. And the officer thought they were flare ones at the first. I don't know if it... What is the standard that there is no evidence in the record from which the jury could... From which could be inferred? What is the standard by which we can infer? No, if it's not clear, there has to be a view of the evidence that could lead a reasonable jury to find this beyond a reasonable doubt. But we still have the reasonable doubt lurking inside of that relationship. And so that's why we have cases like Moreland which say that mere surmise or piling inferences on top of inferences can't support a verdict. So it's a reasonable doubt because he never admits that he had shotgun shells. There's no evidence in the record that he has experience with shotgun shells. They look similar and they feel similar. Is that the whole gamut? Well, no. The other very important fact... I mean, there's two more very important facts that I think support my position. Number one is it's chambered in a flare gun. It would blow the thing up, wouldn't it? It certainly would, which tends to show, I think, tends to cast doubt on the question of whether or not he was, in fact, well familiar with guns. I mean, that act of chambering a live shotgun shell in a flare speaks of his ignorance of guns louder than an 18-year-old conviction ever would. Because you couldn't ever use that and it would ruin it the first time. You couldn't use the second one. Without an insert, it certainly would. It certainly would. And it wouldn't be safe to you, to a person that wanted to do that. But I think the fact that it's chambered is also significant as to its knowledge because the flare gun primes the mind to think that it might be a flare shell. And I think the video shows that pretty well. The government's right. When the officer pulls the shell out of his pocket, the officer says, why do you have a shotgun shell? Found it. Right? So he's thinking shotgun shell because that's what he saw. Then when he sees, pulls it out of the flare gun, then he exhibits confusion. Shotgun shell, flare shell. Hmm, he had one of those in his pocket. What is this? Right? Could this be a flare gun? So if that's the condition in which Mr. Seekins found it, then that's a very significant fact in trying, in helping us assess whether or not there's doubt about what he thought it was. But that's what the jury was told. I mean, in this case, we've got a jury case, you know. It's a jury case. I have no doubt that you or somebody made that poignant argument to the jury. But they're saying, okay, he had shotguns 18 years ago, and I thought there was evidence of multiple shotguns. So you argue it was a stretch for a jury to believe that somebody who owned shotguns, however many years ago, is totally oblivious to what a shotgun shell might be? I think that it is a stretch to assume that 18 years ago. It's also... A reasonable jury, in other words, a reasonable jury couldn't conclude that you say that's piling an inference on an inference? Is that what your argument was? I mean, is? If there were no, if there were no flare gun, if he was merely pulling a shotgun shell out of a pocket, that's probably what comes to mind. That's fair. But given the significant context that it's in a flare gun, then that becomes much more difficult and requires a little bit more evidence for them to show, especially considering that the officer exhibits confusion as to whether it's a shotgun shell or a flare shell. I also want to address the government's point that the shotgun shell has been, that the flare launcher has been cut, right? In order, and therefore the shotgun shell fits into that. The first point, and so they want, they say that therefore the jury could have inferred that he knew it was a shotgun shell because he knew it wouldn't have fit in a flare launcher. A few points I want to make about that. The first is that the officer who exhibited confusion about what it was also saw that it had been cut. So the mere fact that it's modified doesn't necessarily demonstrate, empirically does not demonstrate that the knowledge that it is a shotgun shell. There's also at 385 a concession from the arresting officer that he had no evidence that the defendant modified it himself. So we'd never have the defendant know that the defendant was in the position of trying to fit the shotgun shell and failing to do so and therefore realizing that it's not something that fits into this device. So he could, if he found it just as it was, he would have to, we would have to assume that he knows the reason it's been cut is because it doesn't fit and then further infer that the reason it doesn't fit is because it's a shotgun shell. And when you say the modification, you're talking about to the shotgun or to the shell? There's no modification to the shell by Mr. Seekins. I'm talking about the flare. You're talking about the gun. Mr. Page, on your argument that there's not interstate, is that a loser because there's manufactured in Illinois? It's a real tangential, but under our case law, is that a loser? We're talking about the... Interstate nexus of the shotgun shells because they're manufactured in Illinois. Under the Commerce Clause, the Commerce Clause argument presented at the end of the brief. I don't think that's foreclosed. I understand the government's point. They're not out in This court has rejected as applied challenges that asserted that the government has to prove that an individual shell or gun had some effect on interstate commerce. What it hasn't held and what hasn't been presented is that every class, every discrete class of ways to possess guns and firearms, even when aggregated, falls within the Interstate Commerce Clause. The class that I'm focusing on here, which I don't see any law about either way, we have to go back to Lopez and apply things, is the class of scavenged shells. Scavenged shells, shells that somebody picks up and has rather than buys or steals, have a different relationship, no relationship, to commerce. Has anyone ever, any court anywhere, ever ruled that? They haven't ruled that and they haven't ruled the opposite. But there's a big business in scavenging things you scavenge, you people sell. I would concede, I'm not sure I want to concede, but I would say this would be a different and closer case if the government had been required to prove that he scavenged it in order to sell it. Can you address the sentencing error that you talk about? I'd love to. So the evidence I think is quite clear here that if Mr. Seekins had fired the shell, it would have self-destructed. The shell, the propellant in a shotgun shell creates about 12,000 psi of pressure. Why does the district court seem ambivalent about that? Because I didn't see that there was anybody who had done an experiment with this that it ever survived. Right. I mean the experiment that was before the court, and maybe this was the source of some confusion, I don't want to speak for the court, it's a great judge, was that ATF took the propellant powder out of the shotgun shell and then fired it. And so of course it's not going to self-destruct or be anywhere near as likely to self-destruct if you take the gunpowder out of the shell. And sure, it fires under those circumstances because of just a little bit of primer in that circumstance, but that's really not relevant to the question of whether something loaded with the propellant would break the gun. And it's your position that the enhancement's just wrong if it breaks the gun? I mean yes, if it breaks the gun in the way that we have a catastrophic complete self-destruction of the kind that's demonstrated on the video and in all of the experiments. And the reason for that is 5845E, which is incorporated into the guidelines, talks about what the device under consideration is capable of doing. In other words, it can discharge a shot. This is what it can do. It's not capable of discharging a shotgun shot. That's not what it's designed to do. It's not within the capabilities. It's certainly not what it's designed to do. What the government has said, and perhaps there's something to this, is when it blows up, a little part of it goes forward or maybe even out a few feet sort of ineffectually. Most of it goes, blows the top off of it. That's just not what discharge a shot means. It's not what it suggests in 5845, which is talking about weapons discharging a shot. It's talking about pistols. It's not talking about the consequences of a catastrophic user error. It's more like a bomb explosion or something, a little bomb. So I want to talk a little bit about harm based on that error. First of all, just treating that as a factual finding, that it's not clear that it would blow up, if you look at line 12 of page 623, you see that the court, after saying I don't think it's clear either way, well, I don't think it's settled what would happen, on line 12 then says, so I'm treating this as a serious offense. Now maybe that's ambiguous, but at least doesn't demonstrate harmless error as to that factual finding. I would also submit that now the court does disclaim the impact of the guidelines on the sentence. It's a low end sentence. It's 70 months. It's right at the edge of the guidelines. There's nothing else, no other fact in the case that anchors it to 70 months in the sentence. And this court has recognized that one of the ways that the guidelines can affect the sentence or influence the sentence is they may call a particular sentence to mind. This court doesn't have to doubt the sincerity of the district court, but it's a backward looking test as far as harmless error. Perhaps the guideline called the sentence to mind. Thank you. Okay. Thanks, Mr. Fee. You've preserved your rebuttal rights. All right. We'll hear from the government. Good morning. May it please the Court. Elise Alden-Dyfer on behalf of the United States. This court should affirm Mr. Seekins' conviction in his 70 month sentence because there was more than enough evidence for a reasonable jury to find beyond a reasonable doubt that Mr. Seekins knew what he possessed were real shotgun shells and that those shotgun shells had previously traveled in interstate commerce. Mr. Seekins had prior knowledge of firearms and the jury could reasonably infer from that that he also had knowledge of the ammunition that went inside of it. The circumstances under which the shells were found could also lead a reasonable jury to find that he knew what he possessed were real shells. And finally, the evidence showed that there were noticeable differences between the two types of shells. Additionally, the evidence showed that the modified flare gun was capable of discharging a shot. And finally, Section 922G is undoubtedly constitutional, both facially and as applied under this court's well-established precedent. Unless the court prefers otherwise, I'll start by addressing the sufficiency challenges and then I'll move on to sentencing and constitutional as time permits. Mr. Seekins' sufficiency arguments failed because there was more than enough evidence on this point. There are several bases on which to reject his argument, giving proper deference to the jury's finding in this case. First, you heard evidence and as you talked about earlier, Mr. Seekins did in fact have familiarity with firearms. And the jury heard this evidence. They heard that he had a prior conviction for possession of 17 stolen firearms, two of which were in fact the same type of shotgun that accepts the ammunition he was found with. A jury could infer from this that he had, one, retained that knowledge, and two, that he also had knowledge of the shells that went inside of those guns. I think that's a reasonable inference for a jury to make and that inference must be viewed in the light most favorable to the government. What about the fact that they just look so much alike? They look alike and there's a flare gun there which suggests it's a flare gun. It's important to emphasize that they can look alike. They don't all look alike. I encourage you to look at— Are you saying the ones that are in this record, in this brief, are wrong or inaccurate in any way? No, there's definitely quite a few in the record that do look alike, but I encourage you to look at— What about the ones that are in this brief right here? Did these look alike? Are these an accurate representation? Because they look pretty just alike. Yes, the ones that are in the brief definitely look alike, but the jury also saw a variety of other photos of flare shells that look substantially different. What were the ones that were in the case? Did they look alike? There's quite a few in the record that also the jury saw that did look substantially different. I would direct the court to the record at 909. There's a package of Orion shells that were purchased at Walmart that looked substantially different, but I do, in fact, recognize that there are similarities between types of shells, and they can look similar, but there's also noticeable differences. What I really want to highlight here is the circumstances under which he found— under which both shells were found, and those are one being in his pocket, and as Mr. Page mentioned, when Mr. Seegans was asked about it, he was asked, why do you have a shotgun shell, not asked why do you have a shell, and he didn't deny it. The jury can decide what credibility to give that evidence in this case, but the more important circumstances here are the fact that he had a flare gun that had been specifically modified, whether he modified it or not. It had been modified with the inside bore out, the end cut off, specifically to fit a 12-gauge shotgun shell, and that flare gun was found in the center console of the vehicle in which he was living in. He admitted that's where he was staying on the record. He also—it's also apparent, if you watch the video around minute 930, you can see where it's pulled out, very easy for him to access it. There's no evidence that he had this for safety purposes. There's no evidence he was driving around ready to alert the Coast Guard with this device. There's evidence that it had been modified to accept what could conceivably discharge a shot and that he had that for protection, and I think a reasonable jury could infer from this evidence that he knew he possessed a weapon capable of discharging a shot and that he knew what he possessed to go inside of it would, in fact, do what he believed it would do. When you say conceivably discharge a shot, it wouldn't discharge a shot, would it? You said you were going to get to that on your sentencing, but it's relevant for this point as well. When I say that, I mean what the jury was looking at, because the jury wasn't asked to find anything particular about this device, so there wasn't a lot of evidence put forth for the jury about this device, but I think they could infer from the circumstances under which it was found that that's what it was capable of doing. But it wasn't capable of doing that. We know that. I disagree with that for multiple reasons. Okay. Well, let's turn to that, please. Sure. So I think there's three main pieces of evidence that go to whether this device could, in fact, discharge a shot. The first being the ATF actually tested this device. I understand that they tested it under safe conditions, but they nonetheless tested it and, in fact, found that the device, in this case, was capable of discharging a shot. They didn't test-fire it, though, right? They took the BBs out of the actual shell and tested it under those conditions. Which means they didn't test-fire it. They didn't test-fire what? They didn't test-fire it. Isn't that correct? They did test-fire it, but I don't understand. It's not apparent exactly what that entailed because they took the propellant out of the shell, and they tested it under those conditions and determined that the device, in this case, was, in fact, capable of discharging a shot. But that would be if it didn't have the propellant, which would cause it to explode. The second piece of evidence I would point you to, though, is the use of— Am I wrong on that? They didn't have the propellant, which would cause it to explode. That's correct. They didn't have that, but if you— To say if you take out the thing that's going to cause it to explode, it might work, is irrelevant as to whether it works in the manner that it's allegedly been modified, is what you were saying earlier. Well, I think it's important that we also relied on what the ATF has concluded about this unique device. And if you look at the YouTube video that Mr. Page cites in his brief, it's cited in both of our briefs, I encourage you to pay close attention at the slow motion part at minute 529 and again at 543. This video shows a flare gun that has not been modified, and it's been loaded with what's referred to in the video as a mini shotgun shell. And from what I can tell from this, it has less BBs in it. But if you watch the slow motion and even the regular speed, you do in fact see BBs shooting out of this device and hitting a target. It's not one BB, it's not two BBs, it's multiple coming out of this device. Now, I recognize that the actual shell of it does disperse from it, but projectile is in fact going forwards, and I can tell you from watching this video multiple times, I certainly would not want to be standing in front of it when it's pulled with a trigger, and it's mentioned multiple times on the video how dangerous, in fact, this could be. Well, the fact is it's capable of discharging a projectile. You're saying a shot, but it's capable of discharging a projectile, and that's what the test demonstrated, isn't that right? I think that's right. I mean with the BBs coming out? Yes. And for the shell to be kicked away or ejected, that happens any time you fire a shotgun. I mean the shell comes out, but the projectiles are going out from the barrel of the gun. Yes, and I believe that that in itself proves that this can discharge a shot because it is in fact being struck on the primer, and the projectile is coming out of it forwards and could hit whatever is close by to that. And I probably wouldn't want to be standing two feet away from projectiles. I certainly wouldn't. However many there were. But you wouldn't want to be holding it either. No, and I think it's… Because it would just explode up in your face. Exactly. I think it's important to also emphasize that the question here is not whether it's more or less safe to the user or someone standing in front of it. It is in fact whether it is capable of discharging a shot or whether it can expel projectile, which I think meets that definition here. So given all the evidence in this case, the district court finding here was correct, and regardless, any finding here would be harmless error under the Richardson analysis, and I can touch on that briefly. It's apparent that the court made this statement of, the court here said, to the extent that any objections are deemed appropriate by the court of appeals, the court concludes that under all the circumstances of this case, this is an appropriate and fair sentence. The court specifically said this is what it would have imposed under any and all circumstances, and it considered the correct guideline range in doing so. The guideline range was mentioned twice on the record at sentencing, and the district court made this clear statement emphasizing that it did not believe any of its findings on the guideline issue were relevant to its ultimate sentence in this case. Now I'll move on briefly to the constitutional objections. I do think it's important to emphasize here the clear precedent on this issue. This court has repeatedly... Can you explain why it's harmless error? Yes. You said you could, and then I thought you were going to, but you wrapped up. Yes, Your Honor. So under the Richardson method, what you have to prove is that the district court considered the correct guideline range and that it stated that it would impose the same sentence it did regardless. And so here the court clearly considered the correct guideline range because it was mentioned twice on the record at sentencing. The defendants' counsel specifically asked the court to consider a guideline range of between 37 and 46 months in imposing its sentence. And Mr. Page cites one case where the court has held that an explicit statement is required to proceed under the Richardson analysis, but that case is not controlling, and I'll explain why. The Richardson analysis and the cases it relies on do not support such a strict application of the rule. Richardson cites two cases, and that's Duhon and Bonilla, both of which remain good law. In both of those cases, there's scenarios like that here where the court did not explicitly state the alternative guideline range on the record, but it nonetheless found that any error was harmless because the district court had in fact considered the alternative range. In those cases, the alternative range was either mentioned on the record like we have here or in the PSR objections prior to sentencing. And such a strict application does not make sense from a practical standpoint in this case either. We're at 70 in the alternative range. Sorry, what? The alternative range. Can you give it to me again? Was 37 to 46 months, and the ultimate range was 70 to 87 months. So it doesn't overlap in the alternative range? No, it does not overlap. So 70, which is way above the alternative range, so if it was the alternative range, it would be an upward variance. That's correct. And she didn't indicate that she was doing an upward variance. She did not, but she did outline multiple reasons bearing on her decision to impose that sentence, that being the seriousness of the offense, which she specifically pointed out did not depend on her findings as it applies to the flare gun, and she specifically said that issue was not dispositive, which made clear that that was not bearing on her decision here. She only mentioned that in the context of the future and circumstances of the offense, and this is in the record at page 624. She talks about this being a serious offense for two unrelated reasons to the flare gun, that being the fact that he's driving around in a stolen U-Haul and that being the fact that he did, in fact, possess a flare gun for improper purposes. She also discussed his long criminal history. He had several past offenses, and she mentions that he had not learned his lessons yet. She mentions the need to promote respect for the law and justly punish Mr. Seekins. She mentions to protect the public from further crimes for Mr. Seekins, and she mentions a need to deter others from engaging in similar conduct. And so for all of those reasons, she ended up imposing a 70-month sentence unrelated to the guidelines, and so for those reasons, any error in this case would be harmless. And did she say anything about whether or not she would have imposed the same sentence? She did. What her exact words were is, for the record, this is the sentence that the court would have imposed under any and all circumstances. So to the extent that any of the objections are deemed appropriate by the court of appeals, the court concludes that under all the circumstances of this case, this is an appropriate, fair, and reasonable sentence, taking into account all of the factors under 18 United States Code section 3553A, and that's in the record at 625. But we have some case law now that's a little stricter on that now. You can't just do that as a talismanic magic thing to say so that you don't get reviewed, right? So not exactly. Well, yes. I mean, tell us about the case law that says that that statement doesn't immunize where they don't consider the correct guidelines. And you argue that they did, so you think that you would win. But if they don't consider the correct guidelines and it could have influenced, that statement doesn't automatically make you win in this circuit. So I think, if I'm understanding you correctly, the argument that Mr. Page is making is that there has to be a clear statement of the alternative range. Is that what you're referring to? Right. Well, I'm asking you to address the idea that her stating that is not enough for us to just put a gold star. I don't mean any disrespect to the very learned, very excellent district judge. But just because you say at the end, and by the way, that's what I would do anyway for purposes of appeal, it's not an immunization from appellate review. We have had some case law on that. Could you please articulate what the correct standard is under that case law? So I'm not familiar with the exact case law on that specific point, because what I researched here was more on the Richardson analysis specifically and whether there had to be an explicit statement as to the alternative range in this case. But I think what you don't have here is just this disclaimer statement. I think you have all the other circumstances that I outlined as to why she imposed this specific sentence here. You also have the fact that the alternative range was mentioned twice on the record, and it's, I think, important to show that she did consider that based on the fact that she was asked to consider that. It's also important to emphasize that this judgment is, as Mr. Page notes in his brief at footnote two, not one of the judges who makes this type of disclaimer in each case, and I think that's important to consider in this case. She very clearly made a statement about this being the sentence she would have imposed under any and all circumstances, and I think that that needs to be given credibility in this case where she went through a single objection. There's only two guidelines considered. It's not where there's multiple objections and she's maybe ruling on one in one way and one in another. It's very clear what the alternative range would be, and so I think for those reasons it's apparent that she did, in fact, consider the alternative range. And as I mentioned, Richardson relies on two cases where an explicit statement wasn't required. In those cases, Bonilla and Duhon should control in this case. There's still good law, and so the fact that there was not an explicit statement I think is important. Now, the interstate nexus is pretty weak. Have we ever held under these circumstances that it was enough? No. This court has not. This court has repeatedly said that the constitutionality of 922G is not open to debate. It has said that both in the as-applied and facial context. I guess I'm not asking my question very well. What I'm asking is in a circumstance such as this one where it's so attenuated and the gentleman says he was scavenging and there's no purchase or sale or other transaction, I'm talking about the interstate commerce connection under Lopez and other case law. Have we ever held something that was as light as this one was right smack dab in interstate commerce so that we're comfortable that we're not breaking new ground here if we were to affirm? I haven't seen a case that's exactly similar to this where the court has held in any particular way on that, but I haven't found a single case in any circuit where this court has validated the notion that something other than prior connection to interstate commerce has to be proven. Every court to analyze this has held that a past connection is enough, and what he's asking you to do is establish some point where a connection gets broken and a new connection must be established, and I don't think there's any precedent here that has. Is there ever such a point? Does it ever break it? Or if you can say it was manufactured in 1955 in some other place than where it is right now, is that always going to be good enough no matter how it got where it is right now? I think it's hard to think of a scenario where it would, in fact, break this connection given that Congress has intended to legislate on this to the full scope of their ability, and the Supreme Court has emphasized that multiple times because if you had a firearm that was from the 1950s and someone then goes and breaks into a house and steals it, that nonetheless is then back in the chain of commerce. I don't think there's a specific reason that Congress intended to legislate to the full degree that it possibly could, and that is so that it cannot be moved back and forth into and out of commerce, and I think that's why they've established that it doesn't, in fact, move out of commerce. The fact is that it previously had a connection to interstate commerce, and that is sufficient under this Court's precedent and Supreme Court precedent. Your Honor, I see that my time has expired. May I briefly conclude? Any other questions? No, sir. All right. Any more? Okay. All right. Thank you. All right, back to you, Mr. Page. Please support. First thing I want to do is just clear up on 350 of the record that the stipulation in the case does not refer to shells. The stipulation says that he possessed, had stolen shotguns and other guns. There isn't any evidence that he ever previously possessed or knew anything about a shotgun shell. The second point I want to make is— Say that again. What? The stipulation in this case is that he was previously convicted or previously possessed due to his conviction of stolen shotguns. There isn't any evidence that he previously possessed a shotgun shell, and there certainly isn't any evidence that he previously possessed a flare shell. You could have them in both hands and play six differences like in the funny papers, but there is no basis for comparison in this case. The second rebuttal point I want to make is that the factual finding in this case on 623 isn't that it wouldn't have expelled a projectile, discharged a projectile. It's that it isn't settled that it would have self-destructed. So I'm deferential to my opposing counsel's view of the video that she sees a BB coming out of it. I'm not denying that that's there. What I see is a self-destructing firearm, and the district court doubted that it would have self-destructed. And that factual finding, independent of the guidelines, seems to have been relevant to the sentence because then on line 12 of 623 she says, so I am treating this as a serious offense. That factual finding that the science is unsettled, maybe it would have self-destructed. Maybe it would have. It seems to have been relevant to the sentence and is an independent basis to vacate the sentence, even if I'm wrong about the guideline issue. As respects to the harmlessness issue of the guideline issue, I just want to point out that 70 months is a very puzzling sentence to impose independent of the guideline range. There aren't overlapping ranges. 70 months is not a relevant sentence in this case for any reason other than it is the very edge of the guideline range believed applicable. Martinez-Romero and Cardenas, I think, is the case that it cites, the unpublished case that it cites, tell us that one of the ways that a guideline error can be harmless, notwithstanding a guideline disclaimer, is that it happens to have been what called that particular number to the mind of the district court. It's a backward looking, it's did the guideline error matter in the sentencing process. It's not what would happen on remand. And so Martinez-Romero, I think, is the most important case there. As to the question of, you know, What about the judge's use of the language that without regard for guidelines, the correctness of the guidelines range, this is the sentence that would have been imposed? What do you make of that? What I make of that is that it is, is that, first of all, it doesn't follow an explicit recognition of what the alternative sentence is, which under Rico Mejia seems to matter to this court, and that it, although probative, has not been held to be sufficient in all cases by this court. There is precedent that says that is not always enough. What Tanksley says in terms, that is not enough. And part of the reason for that is that it's just when you sentence at the bottom of the guideline. What is it else you're arguing the district court did not do here? You heard Judge Elrott's question to counsel about, you know, not a talismanic statement, but nonetheless the district court seemed to be tuned in on this guy's record. He's got prior convictions. He says it's a serious offense. She goes through the range. She knows where they overlap. She says 70 because it's a serious offense. So I get it. You say she erred, but I mean zero in to me whether or not what she said is Teflon in terms of our review, but it seems the district court was definitely wired in to what this offense was, this guy's background, he's got a jury conviction, et cetera, et cetera. So what are you saying is missing? There isn't always going to be a magic word for a district court. I got that, but my question is what is it you're arguing here that is missing? What's missing is some explanation for 70 months that is particular to 70 months. There are good explanations in the record for why 70 months would be reasonable, but there's no explanation that tethers the particular factual findings, sentencing factors to that number besides the guideline range. I seem out of time. Yeah, you seem to be happy that you're out of time because at any event, I'm going to let the red light extricate you from me following up. All right. Thank you, Ms. Page. You come here often. You always do a good job, and you did today. So we appreciate you and the government. It's not always we get these flare gun cases where we've got to look at YouTube videos and all these other things to try to figure it out. Welcome to 2022. But anyway, the case will be submitted. We'll call the second.